**Wendy B. Griffin (Bar Number 513967)**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**3 World Financial Center, Suite 437**
**New York, New York 10281**
**Tel: (212) 336-0176**
**Fax: (212) 336-1320**
**E-mail: griffinwb@sec.gov**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **07 Civ. ____ (___)** |
| **v.** | **COMPLAINT** |
| **LINDA J. JONES AND LESLIE H. KNOX,** | |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendants Leslie H. Knox ("Knox") and Linda J. Jones ("Jones") (collectively, the "Defendants"):

## SUMMARY

1.      This matter involves a fraudulent scheme to inflate income by prematurely recognizing promotional allowances at The Penn Traffic Company ("Penn Traffic"), a New York-based supermarket chain operator and wholesale food distributor.  Knox, who was a Senior Vice President at Penn Traffic, and Jones, who was a Vice President, orchestrated, directed, and/or participated in the scheme.

2.      Penn Traffic obtained promotional allowances – also referred to as rebates, slotting fees, or vendor allowances – from vendors for various marketing and

promotional activities, such as advertising, special displays, new item placement, price protection, and exclusivity.  From approximately the second quarter of Penn Traffic's Fiscal Year ("FY") 2001 through at least the fourth quarter of FY 2003 (the "Relevant Period"), Penn Traffic prematurely recognized promotional allowances in advance of Penn Traffic's performance of certain key, contingent activities.  The premature recognition of promotional allowances resulted in an improper reduction to the cost of sales ("COS") by Penn Traffic.

3.      To accomplish the fraud, personnel in Penn Traffic's marketing department (the "Marketing Department"), acting at the direction of Knox and Jones, routinely submitted false information to Penn Traffic's accounting department (the "Accounting Department") so that promotional allowances were "pre-billed" or "pulled forward" at the end of fiscal periods in an attempt to meet or come closer to meeting income targets and budget plans for the Marketing Department.  This practice violated Generally Accepted Accounting Principles ("GAAP") and Penn Traffic's internal accounting policies, both of which generally required that promotional allowances be recognized only when a contingent future event actually took place.

4.      As a result of Knox's and Jones' willful misconduct, Penn Traffic misstated its operating income in its public filings in the aggregate by approximately $10 million from the second quarter of FY 2001 to the third quarter of FY 2003.

## VIOLATIONS AND THE RELIEF SOUGHT

5.      By virtue of the conduct alleged herein, Knox and Jones, directly or indirectly, singly or in concert, have engaged in acts, practices and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act")

[15 U.S.C. § 77q(a)]; Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)]; and Rules 10b-5, 13b2-1, and

13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2]; and Knox and

Jones, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], are each also

liable for aiding and abetting Penn Traffic's violations of Sections 10(b), 13(a),

13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a),

78(m)(b)(2)(A) and 78(m)(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13

thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-13].

6.     Unless Knox and Jones are permanently restrained and enjoined, they each

will again engage in the acts, practices, and courses of business set forth herein and in

acts, practices, and courses of business of similar type and object.

7.     By this action, the Commission seeks a judgment: (a) permanently

enjoining and restraining defendants Knox and Jones (i) from violating Section 17(a) of

the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Exchange

Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 thereunder

[17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2], and (ii) from aiding and abetting

violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15

U.S.C. §§ 78j(b), 78m(a), 78(m)(b)(2)(A) and 78(m)(b)(2)(B)] and Rules 10b-5, 12b-20,

13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and

240.13a-13]; (b) requiring defendants Knox and Jones each to disgorge their ill-gotten

gains together with prejudgment interest; (c) requiring defendants Knox and Jones each

to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §

77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) barring

defendants Knox and Jones each from serving as an officer or director of any publicly held company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (e) granting such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

8.    The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21 of the Exchange Act [15 U.S.C. § 78u], seeking to restrain and enjoin permanently the Defendants from engaging in the acts, practices, and courses of business alleged herein, and seeking civil penalties and other relief.

9.    The Defendants, directly or indirectly, each have used the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged herein.

10.    Certain of the transactions, acts, practices and courses of business alleged herein occurred in the Northern District of New York, including conduct by the Defendants while at Penn Traffic's offices in Syracuse, New York.

11.    Accordingly, this Court has jurisdiction over this action, and venue is proper in this district, pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

## THE DEFENDANTS

12.     **Knox,** age 61, resides in Titusville, Florida, and was Penn Traffic's Senior Vice President and Chief Marketing Officer from May 1999 until February 3, 2006, when he was terminated in connection with the conduct alleged herein.

13.     **Jones,** age 48, resides in Reynoldsville, Pennsylvania, and was Penn Traffic's Vice President of Non-Perishable Merchandising from 2003 until February 3, 2006, when she was terminated in connection with the conduct alleged herein.  From 2000 until 2003, Jones was Penn Traffic's Vice President of Grocery, Dairy, and Frozen.

## RELEVANT ENTITY

14.     **Penn Traffic**, a Delaware corporation with headquarters in Syracuse, New York, engages in the operation of supermarket chains, as well as wholesale food distribution businesses, under various trade names in upstate New York, Vermont, and New Hampshire.  Prior to approximately May 2003, Penn Traffic's common stock and warrants were traded on NASDAQ's National Market under the symbols "PNFT" and "PNFTW," respectively.  On May 30, 2003, Penn Traffic filed for Chapter 11 bankruptcy protection for the second time in approximately four years.  Penn Traffic emerged from bankruptcy on April 13, 2005, at which time its existing common stock, which was registered with the Commission pursuant to Section 12(g) of the Exchange Act, was canceled and new common stock was issued to certain claim holders, registered with the Commission pursuant to Section 12(g) of the Exchange Act.

5

## THE DEFENDANTS' ACCOUNTING FRAUD

### Penn Traffic's FY, Internal Budget Plan, and Organizational Structure

15.     During the Relevant Period, Penn Traffic operated on a FY schedule that began in approximately the beginning of February of the year prior to the calendar year designated as the fiscal year.  Specifically, Penn Traffic's FY 2001 began January 30, 2000, and ended February 3, 2001; FY 2002 began February 4, 2001, and ended February 2, 2002; and FY 2003 began February 3, 2002, and ended February 1, 2003.

16.     Penn Traffic created an internal yearly budget plan, broken down into twelve periods, each consisting of four or five weeks, with the ends of periods 3, 6, 9, and 12 corresponding to fiscal quarterly reporting period ends.  Penn Traffic's internal budget plan was also broken down by Departments and Divisions.

17.     During the Relevant Period, the Marketing Department was structured, in part, based upon product category divisions and sub-categories of those divisions.  The product category divisions were responsible for purchasing and merchandising products within their respective division, including negotiating promotional allowances with vendors.  Knox's responsibilities as Chief Marketing Officer included oversight supervision of all Marketing Department personnel, including all product category divisions, with the Vice Presidents or directors of these divisions reporting directly to Knox.  Each of these Vice Presidents or directors reporting to Knox, including Jones, supervised several "category managers" and sometimes other directors, each of whom was responsible for sub-categories of products.  Jones was the Vice-President of the Grocery, Frozen, and Dairy divisions.  Knox reported directly to Penn Traffic's Chief Executive Officer ("CEO").

18.     Knox and Jones orchestrated, directed, and/or participated in a fraudulent scheme to inflate income and other financial results by pre-billing or pulling forward promotional allowances in an attempt to meet internal period end budget plan figures. Although the pre-billing or pulling forward of promotional allowances was most extensive at financial reporting quarter ends (during periods 3, 6, 9, and 12), Knox and Jones also directed subordinates to pull forward promotional allowances during internal period ends to meet internal budget plans.

**Penn Traffic's Promotional Allowance Policies and Relevant Accounting Principles**

19.     Penn Traffic obtained promotional allowances from its vendors for various promotional and marketing activities, including advertising, special displays, new item placement, price protection and exclusivity.

20.     Penn Traffic's policies generally required that merchandising agreements entered into with vendors for promotional allowances be set forth in a "deal sheet," a form which summarized the parameters of the agreement, the event or performance date(s), and the agreed upon payment.

21.     Invoices to vendors for promotional allowances were created either by an automated process or manually.  Deal sheets were generally required to be entered by Marketing Department personnel into an electronic tracking system ("ETS") used by the Accounting Department.  After a promotional event actually occurred (*e.g.*, an advertisement ran in a newspaper), Marketing Department personnel were generally required to submit appropriate confirmations of the event to the ETS, which then automatically generated an invoice to bill the vendor for the agreed upon amount set forth in the deal sheet.  In some instances, Penn Traffic policies permitted Marketing

Department personnel to submit manually created invoice requests to the Accounting
Department with appropriate documentation of the merchandising agreement and
confirmation of performance.

22.     Penn Traffic accounted for most promotional allowances received from
vendors as a reduction to the COS.

23.     The rules and regulations of the Commission provide that financial
statements that are not prepared in accordance with GAAP will be presumed to be
misleading or inaccurate [Regulation S-X, 17 C.F.R. § 210.4-01(a)(1)].

24.     GAAP requires that revenues or gains be recognized only when the
revenues or gains are both: (1) realized or realizable, and (2) earned.  Revenues and gains
are realized under GAAP when services are exchanged for cash or claims to cash.
Revenues and gains that involve an "earnings process" are earned under GAAP when an
entity has substantially accomplished what it must do to be entitled to the benefits
represented by the revenues or gains.  GAAP similarly prohibits contingencies that might
result in gains from being recognized before the contingency is eliminated.

25.     GAAP also requires that expenses, such as the COS, be matched with
revenues and be recognized at the same time as the revenues that result directly and
jointly from the same transactions or other events as the expense.

26.     By orchestrating a scheme to pull forward promotional allowances, Knox
and Jones caused promotional allowances to be recognized before contingent future
events took place and thereby caused Penn Traffic to violate GAAP.

27.     During the Relevant Period, Penn Traffic's policies with respect to the
recognition of promotional allowances generally required that promotional allowance

monies be recognized as reductions to the COS only once a contingent future event or events constituting performance of the applicable merchandising agreement took place. Penn Traffic's promotional allowance accounting policies and procedures were communicated to Penn Traffic personnel with responsibilities over promotional allowances, including Knox and Jones, verbally and in e-mails beginning in at least mid-2000.

28.     Knox's and Jones' conduct of orchestrating a scheme to pull forward promotional allowances violated Penn Traffic's internal accounting policies.

29.     To ensure proper accounting for a particular promotional allowance, the deal sheet, confirmation, and/or manually created invoice request with supporting documentation should have reflected the true purpose of, and effective dates for, the payment.  To engage in the pre-billing or pulling forward of promotional allowances, Knox and Jones each directed, was aware of, or recklessly disregarded that Marketing Department personnel under Knox's and Jones' supervision misrepresented the information contained in the deal sheets, confirmations, manually created invoice requests, and/or in the supporting documentation provided to the Accounting Department to make it look like the payment was for past performance, when in truth it related to future obligations.

**Improper Techniques Used to Pull-Forward Promotional Allowances**

30.     Beginning in at least the second quarter of Penn Traffic's FY 2001, Knox and Jones began to implement a variety of methods to "pre-bill" or "pull forward" promotional allowances in or around internal period ends in an attempt to meet internal budget plans.

31.     Knox and Jones each carefully monitored the financial performance of their areas of responsibility and thus knew when those results would not meet the internal budget plan.  Typically, if there was a shortfall to the internal budget plan, Knox and Jones each sought out, and/or directed subordinates to seek out, opportunities to pull forward funds from upcoming merchandising agreements for promotional allowances. Knox and Jones took advantage of the approximately two-week time period between the end of Penn Traffic's fiscal period and the close of the accounting records for that period (the "accounting window period") to accomplish much of the pre-billing or pulling forward of promotional allowances.

32.     The promotional allowances were pre-billed or pulled forward by presenting false information to the Accounting Department to make it look like a payment was for past performance while the true terms of the payments related to future obligations.  The deal sheet for the future merchandising event from which the funds were pulled forward was then deleted – if the full amount of funding was pulled forward – or revised to reduce the funding by the amount pulled forward.

33.     Penn Traffic pre-billed or pulled forward several types of promotional allowances, including but not limited to, "lump sum" advertising allowances, "scan down" advertising allowances, slotting fees, vendor rebates and accruals, and "upfront" contract payments.

**Lump Sum Advertising Allowances**

34.     "Lump sum" advertising allowances are payments of fixed fees under a merchandising agreement in exchange for advertisement of a particular product in Penn Traffic's weekly newspaper circulars.

35.     During the Relevant Period, the Accounting Department's promotional allowance policies and practices were that funds received from "lump sum" advertising allowances were earned the week that the advertisement was run.

36.     Jones determined how much promotional allowance money might be available to pull forward by looking at lump sum advertising allowance merchandising agreements for upcoming weeks after period end and having an assistant total up those amounts.  At Jones' direction, the directors and category managers under her supervision routinely pulled forward lump sum advertising allowances.  Knox was aware of or recklessly disregarded Jones' conduct.

37.     For example, in an e-mail dated January 17, 2002, from Jones to her subordinate category managers (and copying Knox), eleven days before the internal period 12 and fiscal year end 2002, Jones listed the discounts and allowances identified as of that date, noting a shortfall of approximately $2 million to the internal budget plan, and identified as a "Contingency Option[]" the "Lump Sum Ad Payments" for the week ending February 9, 2002, of $104,200.  Advertisements running during the week ending February 9, 2002, would occur during Penn Traffic's FY 2003 and lump sums paid for those advertisements could not properly be booked in FY 2002.  After receiving this e-mail, category managers under Jones' supervision pulled forward lump sum advertising allowances into period 12 of FY 2002 for advertisements that did not run until FY 2003.

38.     In order to pre-bill the funds due for future lump sum advertising allowances, Jones instructed her subordinates to obtain the consent and assistance of the vendor's representative to provide false back-up, often in the form of an e-mail, to match the manual invoice request which falsely stated that the invoice was for "additional"

payments on a past advertisement, even though the payment was actually for advertisements that had not yet run.  The consent and assistance of the vendor's representative was obtained by promising that the future advertisement would still run and that the vendor would not be billed for it twice.

39.     For example, in order to pre-bill lump sum advertising allowances in the fourth quarter of FY 2003 for advertisements that were not scheduled to run until the first quarter of FY 2004, a Penn Traffic category manager under Jones' supervision obtained an e-mail from a vendor representative, dated January 9, 2003, which stated: "Just a note to confirm our conversations that you are authorized to claim and bill $10,000 for Advertising Performance from [vendor] for your holiday ad of 12/8/02."  The vendor representative then forwarded this e-mail back to the same Penn Traffic category manager three minutes later with the message: "First one for accounting… This is for you and me.  Payment of $10,000 below is for ads of 2/2/03: [product name]… originally at $5,000… now no charge.  [product name] ad of 2/16/03, originally at $5,000, now no charge."  As a result of this conduct, Penn Traffic recognized the $10,000 from this promotional allowance as a reduction of COS in its fourth quarter of FY 2003 instead of its first quarter of FY 2004.

**"Scan Down" Advertising Allowances**

40.     "Scan down" advertising allowances are payments based upon the actual quantity of an advertised item sold during a specified period of time in exchange for advertisement of a particular product in Penn Traffic's weekly newspaper circulars.  The quantity of the advertised item sold was measured by the number of times that the item's

bar code was scanned during checkout at Penn Traffic's stores, *i.e.*, when a consumer actually bought the product and left the store with it.

41.     During the Relevant Period, the Accounting Department's promotional allowance policies and practices were that funds received from "scan down" advertising allowances were earned the week(s) specified in the merchandising agreement during which the quantity sold would be measured.

42.     Jones directed the category managers under her supervision to manipulate the scan down promotional allowances in order to pre-bill the promotional allowance funds earmarked for the scan down allowance through the use of three invoices.  First, Jones instructed the category managers under her supervision to pull forward a portion of the projected value of the future scan by creating a manual invoice to immediately bill vendors for "additional" promotional allowances on previous merchandising events. Simultaneously, the value of the future scan was decreased (usually to $.01 per item scanned) to act as a place holder to track the pre-billing and allow for a "true up" at the time of actual performance.  At the time of the actual scan, a second, automated invoice would be generated by the ETS reflecting the number of items scanned multiplied by the reduced scan rate.  Finally, a third invoice request was created manually to "true up" the difference between what Penn Traffic would have received under the originally agreed upon scan rate using the data from the actual scan and what Penn Traffic actually received (the pre-billed amount plus the reduced scan amount).

43.     For example, Penn Traffic booked invoices for $40,000 and $95,717.12 in the second quarter of FY 2003 for performance on a scan down advertising allowance that did not occur until the third quarter of FY 2003.  In this instance, Penn Traffic not

only pulled forward an amount prior to the scan occurring – a portion of the projected value of the future scan – but also pulled forward the "true up" invoice by taking advantage of the accounting window period.

      a.     First, in order to pull forward $40,000 from a scan down merchandising agreement that was to take place during the first week of the third quarter of FY 2003, at Jones' direction or with her direct knowledge, a category manager under Jones' supervision issued a falsified invoice request in the amount of $40,000 for "Additional Promotional Allowance for [product name] Ad June Purchases," which due to the June date was recorded in the second quarter of FY 2003.  As back-up for the invoice request, the category manager obtained an e-mail from the vendor's representative, which stated, "This is to approve the $40,000 billing for [product name] for the promotional event."  The category manager also attached purchase orders of the product from June.

      b.     At Jones' direction or with her direct knowledge, the scan down merchandising agreement for the product scheduled to take place during the first week of the third quarter of FY 2003 was reduced to a penny.

      c.     After the scan down event for the product took place, an automated ETS invoice was issued based on the penny scan rate and properly booked in the third quarter of FY 2003.

      d.     Jones then took advantage of the accounting window period to pull forward the "true up" of the scan down allowance for the product into the second quarter of FY 2003, even though the scan did not occur, and the actual results of the scan were not known, until the third quarter of FY 2003.  Jones personally initialed an invoice

request in the amount of $95,717.12 for "Additional Scan Billing for [product name] Ad" which attached, as back-up, purchase orders for July and an e-mail from the same vendor representative to the category manager, which stated, "As per our discussion you may deduct the balance $95,717.12 for your July purchase [sic] for the [product name]."  The July date was false, as the scan did not occur until August.  Due to the July date on the invoice request, the $95,717.12 was recorded in the second quarter of FY 2003.

       e.    Taking into account the $40,000 invoice and the amount billed through the automated penny scan invoice, the remaining amount that the vendor would owe for the August scan promotion for the product as originally agreed upon was $95,717.12 – the exact amount that Jones had put in the manual invoice request.

**Slotting Fees**

44.    "Slotting fees" are upfront payments by a vendor to Penn Traffic in exchange for Penn Traffic's agreement to introduce and carry a new item on its shelves.

45.    From approximately 2000 until early-to-mid 2002, the Accounting Department's promotional allowance policy provided that slotting fees were earned in full when a merchandising agreement for new item slotting fees was entered into and a purchase order was issued to the vendor with a due date for the shipment of the first order of the product within a reasonable amount of time.  As part of that policy, the Accounting Department required that Marketing Department personnel submitting invoice requests for slotting fees provide the signed merchandising agreement and the issued purchase order which specified the due date for the shipment of the first order of the product. However, prior to early-to-mid 2002, Penn Traffic's accounting department was inconsistent about enforcing its policy of requiring back-up to an invoice for slotting fees

before recording the funds.  During the time period in which the policy was

inconsistently enforced, Jones directed category managers to submit invoice requests for

slotting fees prior to the time when a purchase order for the new product had been issued

and without attaching a purchase order for the new product.

46.     In approximately February 2002, the Accounting Department informed

Knox and Jones that there were at least two instances identified by the Accounting

Department in which employees under Knox's and Jones' supervision submitted falsified

invoice requests, in the amounts of $25,000 and $35,000, for "additional merchandising

funds" relating to October promotional events that, due to the October reference (the last

month of Penn Traffic's third quarter), were booked in the third quarter of FY 2002, but

actually related to new item slotting fees on products that were not going to be available

for several months.

47.     Subsequently, the Accounting Department questioned a number of slotting

fee invoice requests issued by employees under Jones' supervision from the prior year

due to a lack of supporting documentation.  Jones instructed the category managers under

her supervision to provide purchase orders for the same "type" of products (although

unrelated to the invoice in question) in an amount that would justify the invoice being

questioned.

48.     In approximately mid-2002, the Accounting Department's policy

pertaining to the recognition of slotting fees changed to require that payments of new

item slotting fees be spread over a six-month or one-year period, instead of booked in full

at the time the purchase order was issued.  After this change in policy, Jones instructed

the category managers under her supervision to falsely characterize slotting fees as other

types of promotional allowances in order to record the money immediately and circumvent Accounting Department policies.  For example, Penn Traffic prematurely booked $125,000 in the second quarter of FY 2003 that was actually for new item slotting fees for seventeen products that would not be available for shipment until the third quarter of FY 2003.  In order to pre-bill the $125,000, at Jones' direction or with her direct knowledge, a category manager under Jones' supervision submitted two falsified invoice requests on the same date to the accounting department (for $65,000 and $60,000), which mischaracterized the slotting fees as additional promotional payments. Jones knew that these fees were slotting fees and not additional promotional allowances as described in the two falsified invoices.  In an e-mail dated July 24, 2002, from Jones to the category managers under her supervision, Jones identified all of the discounts and allowances for the last internal period of the second quarter of FY 2003 and listed under the heading of "slotting" the $125,000 for items next to the name of the category manager who had submitted the two falsified invoice requests.

**Vendor Rebates and Accruals**

49.     Vendor rebates are fixed monetary amounts paid to Penn Traffic by a vendor based upon the amount of a specific item purchased from the vendor pursuant to a merchandising agreement.  Vendor accruals are payments to Penn Traffic by a vendor based upon Penn Traffic meeting certain targeted sales figures, rather than just total sales, pursuant to a merchandising agreement.

50.     During the Relevant Period, the Accounting Department's policy was that rebates and accruals were earned based upon reaching certain purchase volumes

established in the merchandising agreement and were booked at intervals which were also established in the written merchandising agreement.

51.     At Jones' direction, the category managers and directors under her supervision pulled forward vendor rebates and accruals by billing vendors for rebates and accruals based upon future, not-yet-purchased items so that the funds could be booked in the current or prior period.

52.     For example, Penn Traffic entered into agreements with soft drink companies to receive rebates from the manufacturer based upon certain volumes of soda sold.  On a monthly basis, Penn Traffic booked estimates of the amount of product that had been sold during that month and reconciled these estimates to actual sales for the quarter when the manufacturer paid Penn Traffic on a quarterly basis in accordance with the written merchandising agreement.

53.     After Jones' subordinate responsible for soft drinks informed Jones of the subordinate's estimate for a monthly period, Jones instructed the subordinate to increase the soda estimate at period ends beginning in approximately early 2001 and continuing until late 2002.  Jones knew or recklessly disregarded that these increased estimates were inaccurate and were greater than the amount of product that was sold during such periods. On at least one occasion during the Relevant Period, Knox also directed Jones' subordinate to increase the soda estimate.  Knox knew or recklessly disregarded that this increased estimate was inaccurate and was greater than the amount of product that was sold during that period.

54.     Knox knew or recklessly disregarded that his subordinates were pulling forward rebate monies.  For example, a director who was one of Knox's direct reports

told Knox via e-mail dated November 10, 2001, that in order to make his budget for the

third quarter the director took November rebates not due until the fourth quarter and

applied them to October, which is in the third quarter.

**Upfront Contract Payments**

55.    Penn Traffic entered into annual merchandising agreements with some

vendors to provide a variety of merchandising benefits for the vendors' products, such as

in-store displays, drink coolers placed in checkout lanes, and exclusivity, in exchange for

item purchase pricing and payments as specified in the agreements.

56.    During the Relevant Period, the Accounting Department's policies

required that all contract money, including upfront payments and signing bonuses, greater

than $100,000 be spread over the life of the contract.

57.    In order to pull forward a portion of the contract payments, Knox and

Jones participated in negotiating contracts that included lump sum "signing bonuses"

with commensurate reductions in the other payment arrangements specified in the

contracts.  Knox and Jones then each directed their subordinates to create, or was aware

that their subordinates created, fraudulent invoice requests that characterized the "signing

bonuses" in excess of $100,000 in a way that would not require that amount be spread

over the life of the contract.  In some instances, Knox and Jones also directed

subordinates to create, or was aware that their subordinates created, fraudulent invoice

requests that would cause these "signing bonuses" to be booked in a period prior to the

time the contract was even signed.

58.    For example, in order to bolster FY 2002 results, Jones renegotiated a

three-year agreement with a soft drink manufacturer for checkout lane coolers that was to

begin February 1, 2002, and was not signed until at least February 22, 2002, to include an upfront payment and a commensurate reduction in the annual rate paid per cooler.  Even though the contract was not signed until the first quarter of FY 2003, Jones directed her subordinate to have the upfront payment booked in the fourth quarter of FY 2002 by creating two manual invoice requests submitted on the same date, one for $92,700 and the other for $53,100, as "non-refundable signing bonuses," to also circumvent the policy to spread contract payments in excess of $100,000 over the life of the contract.

59.     As another example, Knox directed one of the directors under his supervision to negotiate and book in the fourth quarter of FY 2002 an upfront payment of $250,000 from a vendor for a packaged salad exclusivity contract that was still being negotiated and that was ultimately never entered into.

**Material Misstatements and Omissions of Fact**

60.     As a result of pre-billing or pulling forward promotional allowances, orchestrated by Knox and Jones, Penn Traffic's reported operating results, among other results, as reported in Penn Traffic's Forms 10-Q and 10-K filed with the Commission during the Relevant Period were misstated, in total, by approximately $10 million of improperly recognized promotional allowances from the second quarter of FY 2001 to the third quarter of FY 2003:

| Penn Traffic Fiscal Period | Approximate Overstatement[1] | Originally Reported Operating Income (Loss) | % of Understatement of Loss or Overstatement of Income |
|---|---|---|---|
| Q2 FY01 | 32,693 | (10,827,000) | 0.3% |
| Q3 FY01 | 25,000 | (19,173,000) | 0.1% |
| Q4 FY01 | 457,597 | (4,786,000) | 9.5% |
| Total FY01 | 515,290 | (51,145,000) | 1.0% |
| Q1 FY02 | 432,709 | (17,046,000) | 2.5% |
| Q2 FY02 | 1,307,455 | (8,938,000) | 14.6% |
| Q3 FY02 | 1,537,278 | (16,230,000) | 9.5% |
| Q4 FY02 | 3,307,106 | (5,984,000) | 55.3% |
| Total FY02 | 6,584,548 | (48,198,000) | 13.7% |
| Q1 FY03 | 1,691,293 | 10,620,000 | 18.9% |
| Q2 FY03 | 592,612 | 14,150,000 | 4.4% |
| Q3 FY03 | 447,578 | (205,000) | 218.3% |
| Q1-Q3 FY03 | 2,731,483 | | |
| Total | 9,831,321 | | |

61.     As a consequence, Penn Traffic made material misstatements and omissions of material fact concerning Penn Traffic's earnings for the second quarter of FY 2001 through the third quarter of FY 2003 in various public documents, including in Forms 10-Q and 10-K filed during the Relevant Period, and in connection with the offer, purchase and sale of securities.  Penn Traffic's reported results were also false and misleading because they did not comply with GAAP and failed to disclose the practice of pre-billing or pulling forward promotional allowances.

62.     In September 2002, Penn Traffic restated its financial results (the "2002 Restatements") due to fraudulent conduct that occurred at Penn Traffic's wholly-owned bakery manufacturing subsidiary, Penny Curtiss, from approximately 1997 through 2002. That fraud was previously the subject of an injunctive action brought by the Commission, SEC v. Lawler, 05 CV 1233 (DNH) (N.D.N.Y.) (Sept. 29, 2005).

63.     Even after the 2002 Restatements, Penn Traffic's operating loss was still understated, and in the one quarter for which Penn Traffic did report operating income,

---

[1] The approximate overstatement amounts stated in this Complaint do not include the effect of rebooking promotional allowances that were improperly pre-billed or pulled forward in prior quarters.

that income was still overstated, among other results, as a result of the pre-billing or

pulling forward of promotional allowances:

| Penn Traffic Fiscal Period | Approximate Overstatement | Restated Operating Income (Loss) | % of Understatement of Loss or Overstatement of Income |
|---|---|---|---|
| Q2 FY01 | 32,693 | (10,827,000) | 0.3% |
| Q3 FY01 | 25,000 | (19,173,000) | 0.1% |
| Q4 FY01 | 457,597 | (8,538,000) | 5.4% |
| Total FY01 | 515,290 | (54,897,000) | 0.9% |
| Q1 FY02 | 432,709 | (18,174,000) | 2.4% |
| Q2 FY02 | 1,307,455 | (10,312,000) | 12.7% |
| Q3 FY02 | 1,537,278 | (17,089,000) | 9.0% |
| Q4 FY02 | 3,307,106 | (7,402,000) | 44.7% |
| Total FY02 | 6,584,548 | (52,977,000) | 12.4% |
| Q1 FY03 | 1,691,293 | 9,423,000 | 21.9% |
| Total | 8,791,131 | | |

64.    Penn Traffic's restated results contained material misrepresentations and

omissions of fact concerning Penn Traffic's earnings for the second quarter of FY 2001

through the first quarter of FY 2003 in amended Forms 10-Q and 10-K, and in connection

with the offer, purchase and sale of securities.  Penn Traffic's restated results were also

false and misleading because they did not comply with GAAP and failed to disclose the

practice of pre-billing or pulling forward promotional allowances.

65.    In addition, Penn Traffic repeated the misstatements it made in its

Commission filings during the Relevant Period by incorporating them by reference in a

Form S-8 Registration Statement filed by Penn Traffic on October 1, 1999 (the "Form S-

8).  The Form S-8 specifically incorporated by reference all documents filed with the

Commission by Penn Traffic pursuant to Sections 13(a), 13(c), 14 and 15(d) of the

Exchange Act after the date of the Registration Statement and prior to the filing of a post-

effective amendment to the Registration Statement indicating that all securities offered

have been sold or which deregisters all securities then remaining.  Penn Traffic did not

terminate the offering through a post-effective amendment during or before the Relevant

Period.  As a result, all of Penn Traffic's subsequent Forms 10-Q and 10-K filed with the

Commission during the Relevant Period, were incorporated by reference into the Form S-

8.  Penn Traffic offered and/or sold securities pursuant to the Form S-8 during the

Relevant Period.

66.     In press releases announcing quarterly and year-end financial results, Penn

Traffic also materially overstated its "adjusted net income," a term Penn Traffic defined

in its press releases as net income excluding amortization of excess reorganization value,

unusual items, and certain special costs, among other results, as a result of the pre-billing

and pulling forward of promotional allowances.   The improperly recognized promotional

allowances represented material percentages of Penn Traffic's reported "adjusted net

income":

| Date of Press Release | Penn Traffic Fiscal Period | Approximate Overstatement | Press Release Reported "Adjusted Net Income" (Loss) | % of Overstatement of Reported Adjusted Net Income or Understatement of Adjusted Net Loss |
|---|---|---|---|---|
| 9/6/00 | Q2 FY01 | 32,693 | 4,300,000 | 0.8% |
| 12/6/00 | Q3 FY01 | 25,000 | (1,000,000) | 2.5% |
| 3/30/01 | Q4 FY01 | 457,597 | 5,600,000 | 8.9% |
| 3/30/01 | Total FY01 | 515,290 | 7,200,000 | 7.7% |
| 6/12/01 | Q1 FY02 | 432,709 | 200,000 | 216.4% |
| 9/13/01 | Q2 FY02 | 1,307,455 | 5,300,000 | 32.7% |
| 12/11/01 | Q3 FY02 | 1,537,278 | 2,300,000 | 201.5% |
| 4/2/02 | Q4 FY02 | 3,307,106 | 7,100,000 | 87.2% |
| 4/2/02 | Total FY02 | 6,584,548 | 15,000,000 | 78.2% |
| 6/12/02 | Q1 FY03 | 1,691,293 | 1,100,000 | 154.0% |
| 9/18/02 | Q2 FY03 | 592,612 | 2,700,000 | 28.1% |
| 12/13/2002 | Q3 FY03 | 447,578 | (4,500,000) | 9.9% |

67.     As a consequence, Penn Traffic made material misstatements and

omissions of material fact concerning Penn Traffic's adjusted net income for the second

quarter of FY 2001 through the third quarter of FY 2003 in press releases publicly

announcing financial results during the Relevant Period.

## DEFENDANTS' ROLES IN THE FRAUDULENT CONDUCT

### Knox's Misconduct

68.     During the Relevant Period, Knox was Penn Traffic's Chief Marketing Officer.  As Chief Marketing Officer, Knox was responsible for all sales, income, and expenses for all Penn Traffic stores, as well as the advertising and merchandising of products.  Knox's direct reports included the Vice Presidents and directors responsible for the product category divisions, including Jones.

69.     It was important to Knox that the Marketing Department meet or beat the internal budget plans set for the Marketing Department.  Knox kept track of how close the Marketing Department was to obtaining its internal period end, fiscal quarter end, and fiscal year end budget plans.  Penn Traffic's senior management, including Knox, received on a weekly basis an internally generated status report of the results of operations, including line items for promotional allowances.

70.     Knox knew, or recklessly disregarded, the fact that promotional allowances are paid by vendors based upon actual performance by Penn Traffic of promotional activities, and that the receipt of promotional allowances impacted Penn Traffic's operational results.

71.     Notwithstanding this knowledge, in his capacity as the direct supervisor of the Vice Presidents and directors responsible for the product category divisions, Knox repeatedly directed his subordinates to submit additional invoices during the accounting window period which pulled forward promotional allowances from a future fiscal period. For example, in an e-mail dated May 15, 2002, more than a week after the calendar close of Penn Traffic's First Quarter FY 2003, Knox wrote to his subordinates with subject line

"Shake the trees," instructing them to "get more money" for the First Quarter.  Knox continued, "As I said before the Q1 is important to make.  The books are being kept open."  On May 16, 2002, Knox sent another e-mail to his subordinates, including Jones and several of the category managers under Jones' supervision, directing an amount for each of the recipients of the e-mail to "secure" for the First Quarter, which totaled $685,000.

72.     On January 3, 2002, Knox sent an e-mail to his direct reports with subject line "P[eriod] 11 Gross Margin Dollars," stating, "We cannot end the period at the numbers we discussed last night.  I have given some though [sic] independently and would ask you to go back and get these additional monies."

73.     Knox routinely directed his subordinates to "get" or "find" additional money to meet internal budget plan numbers after the internal period end, fiscal quarter end, and fiscal year end, even though Knox knew or recklessly disregarded there were no legitimate ways to "get" or "find" additional money after the fiscal period, quarter, or year had ended.  For example, Knox received an e-mail from one of the directors who reported to him on July 10, 2002, stating that the director's product division would be $55,000 short of forecast for the fiscal period that had ended more than a week prior and for which the accounting window period closed the following day, and stating, "I really don't have any more money without doing some goofy."  Knox replied to this e-mail on the same date, instructing the director to "get" an additional $30,000.

74.     In another e-mail, dated April 10, 2001, Knox instructed one of his direct reports, who had written to Knox that he expected to be short of his March forecast number:  "I need you to be at the 2400 [March forecast] number [in thousands] that was

turned in last week.  If you need to make some 'adjustments' for April to do this then you need to do what you need to do. . . .  You will need to turn in the $2400 on forecast."

75.     In some instances, Knox asked personnel in the Accounting Department to hold open the close of a fiscal period so that additional money that was pulled forward could be booked, falsely contending to the Accounting Department that additional invoices which belonged in the fiscal period were going to be submitted.  Knox knew or recklessly disregarded that there were no other invoice requests that properly belonged in the fiscal period.

76.     Virtually all of the product category divisions under Knox's supervision pre-billed or pulled forward promotional allowances at the end of a fiscal period, quarter, or year to attempt to meet internal budget plans.  Knox directed, was aware of, or was reckless in not knowing that the Grocery, Frozen, Dairy, Direct Store Delivery, Health and Beauty Care, Meat, Deli, In-Store Bakery and Produce divisions, all of which were under his supervision, pre-billed or pulled forward promotional allowances, including but not limited to lump sum advertising allowances, scan down advertising allowances, slotting fees, vendor rebates and accruals, and up-front contract payments.

77.     Knox knew, or recklessly disregarded the fact, that the promotional allowances that were pre-billed or pulled forward from a future quarter would be recognized as a reduction of COS by the Accounting Department in a prior quarter's reported financial results reflected in Penn Traffic's public filings.

78.     In some instances, Knox personally directed subordinates to pre-bill or pull forward promotional allowances.  For example, in one e-mail from Knox to his direct reports, dated December 11, 1999, with subject "Year End Money," Knox wrote:

"Currently our year end income totals approximately $2M.  We think there is more money to be had here for a company of our size and volume…. [I]f any of you have suppliers or programs that are on an annual reup basis you should figure out how to extract more money from the company either on a volume incentive basis (we'll take the money up front and performance will come within the calendar year) or offer up an increase in space or ad activity will get us an upfront payment for performance later on."

79.     Knox knowingly misled Penn Traffic's CEO, Chief Financial Officer ("CFO") and Chief Accounting Officer ("CAO") about pre-billing or pulling forward promotional allowances.  During a Management Assurances meeting held with Knox and attended by Penn Traffic's CEO, CFO, and CAO on December 3, 2002, in connection with Penn Traffic's third quarter FY 2003 Form 10-Q filing, Knox falsely represented that all promotional allowances recorded in Penn Traffic's financial statements for the third quarter FY 2003 year-to-date had been earned and that no future performance was required.  Knox knew that this representation was false because he was aware of promotional allowances during the first, second, and/or third quarters of FY 2003 that had been recorded prematurely and required future performance from the date on which they were booked.

80.     Knox also knowingly signed false internal certifications, obtained in connection with Penn Traffic's Forms 10-Q for the second quarter of FY 2003 and the third quarter of FY 2003, which represented that the draft 10-Qs for those periods and internal detailed operating statements for the Marketing Department, which included line items for promotional allowances, did not contain any material misstatement or omission. Knox knew that his certifications were false because he was aware of promotional

allowances during the second and third quarters of FY 2003 that had been recorded prematurely and required future performance from the date on which they were booked.

81.     Knox was eligible for an annual bonus representing 40 percent of his base salary if Penn Traffic achieved certain financial goals set forth in the internal budget plans.  Knox received a bonus of approximately $73,200.00 for Penn Traffic's FY 2002, which was based, in part, on Penn Traffic meeting certain percentage thresholds of the internal budget plan.  Knox received approximately $13,725 in bonus money that he would not have otherwise received as a result of the pre-billing or pulling forward of promotional allowances in the product category divisions under his supervision.

**Jones' Misconduct**

82.     During the Relevant Period, Jones was Penn Traffic's Vice-President of Grocery, Frozen and Dairy.  In this capacity, Jones was responsible for supervising category managers responsible for purchasing and merchandising sub-categories of grocery products and the directors of Frozen and Dairy.

83.     It was important to Jones that the product category divisions under her supervision meet or beat the internal budget plan for those divisions.  Jones carefully tracked how close her divisions were to obtaining its internal period end, fiscal quarter end, and fiscal year end budget plans.  Penn Traffic's senior management, including Jones, received on a weekly basis an internally generated status report of the results of operations, including line items for promotional allowances.

84.     Although virtually all of the product category divisions under Knox's supervision pre-billed or pulled forward promotional allowances, the practice was most pervasive in the Grocery division, headed by Jones.

85.     As detailed above, Jones directed, was aware of, and/or recklessly disregarded that her subordinates and other Marketing Department personnel engaged in the pre-billing or pulling forward promotional allowances, including but not limited to lump sum advertising allowances, scan down advertising allowances, slotting fees, vendor rebates and accruals, and up-front contract payments, in order to meet internal budget plans at fiscal period, quarter, and year end.

86.     As detailed above, Jones specifically instructed her subordinates and others about how to pre-bill or pull forward promotional allowances in order to meet internal budget plans at fiscal period, quarter, and year end.

87.     As detailed above, in some instances, Jones personally engaged in pre-billing or pulling forward promotional allowances to improve the results of the divisions under her supervision.

88.     Jones was familiar with the Accounting Department policies concerning the recognition of promotional allowances and intentionally or recklessly circumvented these policies and directed her subordinates to engage in conduct that circumvented these policies.

89.     Jones knowingly misled Penn Traffic's CEO, CFO, and CAO about her pre-billing practices.  For example, during a Management Assurances meeting held with Jones and attended by Penn Traffic's CEO, CFO, and CAO on December 3, 2002, in connection with Penn Traffic's third quarter FY 2003 Form 10-Q filing, Jones falsely represented that all promotional allowances recorded in Penn Traffic's financial statements for the third quarter FY 2003 year-to-date had been earned and that no future performance was required.  Jones knew that this representation was false because she was

aware of promotional allowances during the first, second, and/or third quarters of FY 2003 that had been recorded prematurely and required future performance from the date on which they were booked.  In follow-up conversations with Penn Traffic's CFO and CAO after the December 3, 2002, meeting, Jones also lied about her pre-billing practices, stating that Penn Traffic had already earned the money and no future performance was required.

90.     Jones also knowingly signed false internal certifications, obtained in connection with Penn Traffic's Forms 10-Q for the second quarter of FY 2003 and the third quarter of FY 2003, which represented that the draft 10-Qs for those periods and internal detailed operating statements for the product category divisions under her supervision, which included line items for promotional allowances, did not contain any material misstatement or omission.  Jones knew that his certifications were false because she was aware of promotional allowances during the second and third quarters of FY 2003 that had been recorded prematurely and required future performance from the date on which they were booked.

91.     Jones received a bonus of approximately $19,687.00 for Penn Traffic's FY 2002, which was based, in part, on Penn Traffic meeting certain percentage thresholds in the internal budget plan.  Jones received approximately $11,250.00 in bonus money that she would not have otherwise received as a result of the pre-billing or pulling forward of promotional allowances in the product category divisions under her supervision.

## FIRST CLAIM FOR RELIEF

### (Violations of Section 17(a) of the
### Securities Act [15 U.S.C. § 77q(a)])

92.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 91.

93.     Knox and Jones, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of Penn Traffic's securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of Penn Traffic's securities and upon other persons, including in Penn Traffic's filings for FY 2001 through FY 2003, including the Forms 10-K for FY 2001 and 2002, the Forms 10-Q for FYs 2001, 2002, and 2003, the amended Form 10-K for FY 2002 and amended Form 10-Q for the first quarter of FY 2003, and the Form S-8 filed by Penn Traffic on October 1, 1999, incorporating by reference the above filings, and in other public statements.

94.     The misstatements and omissions of fact detailed in paragraphs 1 through 93 hereof were material.

95.     By reason of the foregoing, Knox and Jones, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### (Violations of Section 10(b) of the
### Exchange Act [15 U.S.C. § 78j(b)] and
### Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5])

96.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 95.

97.    Knox and Jones, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of Penn Traffic securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers or sellers of Penn Traffic securities and upon other persons, including in Penn Traffic's filings for FY 2001 through FY 2003, including the Forms 10-K for FY 2001 and 2002, the Forms 10-Q for FYs 2001, 2002, and 2003, the amended Form 10-K for FY 2002 and amended Form 10-Q for the first quarter of FY 2003, and the Form S-8 filed by Penn Traffic on October 1, 1999, incorporating by reference the above filings, and in other public statements.

98.    The misstatements and omissions of fact detailed in paragraphs 1 through 97 hereof were material.

99.     By reason of the foregoing, Knox and Jones, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF

**(Violations of Section 13(b)(5) of the
Exchange Act [15 U.S.C. § 78m(b)(5)] and
Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1])**

100.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 99.

101.     In the manner described in paragraphs 1 through 100 hereof, Knox and Jones each engaged in fraudulent practices in the course of which Knox and Jones each knowingly circumvented a system of internal accounting controls and knowingly falsified, directly or indirectly, or caused to be falsified, books, records and accounts of Penn Traffic that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

102.     By reason of the foregoing, Knox and Jones, singly or in concert, directly or indirectly, have violated, and unless enjoined, will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

### FOURTH CLAIM FOR RELIEF

**(Violations of Exchange Act Rule
13b2-2 [17 C.F.R. § 240.13b2-2])**

103.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 102.

104.    In the manner described in paragraphs 1 through 103 hereof, Knox and

Jones each, directly or indirectly, (a) made or caused to be made a materially false or

misleading statement, or (b) omitted to state, or caused another person to omit to state, a

material fact necessary in order to make statements made, in light of the circumstances

under which they were made, not misleading to an accountant in connection with (1) an

audit or examination of the financial statements of Penn Traffic or (2) the preparation or

filing of Penn Traffic's Forms 10-Q and 10-K filed with the Commission during the

Relevant Period.

105.    By reason of the foregoing, Knox and Jones each violated, and unless

enjoined will again violate Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## FIFTH CLAIM FOR RELIEF

**(Aiding and Abetting Liability for Penn Traffic's Violations of
Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange
Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and
Rules 10b-5, 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.10b-5,
240.12b-20, 240.13a-1, and 240.13a-13])**

106.    The Commission realleges and incorporates by reference herein each and

every allegation contained in paragraphs 1 through 105.

107.    Penn Traffic, directly or indirectly, singly or in concert, by use of the

means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a

national securities exchange, in connection with the purchase or sale of Penn Traffic

securities, knowingly or recklessly, has: (a) employed devices, schemes and artifices to

defraud; (b) made untrue statements of material fact, or has omitted to state material facts

necessary in order to make statements made, in the light of the circumstances under

which they were made, not misleading; and/or (c) engaged in transactions, acts, practices

and courses of business which operated or would have operated as a fraud or deceit upon purchasers or sellers of Penn Traffic securities and upon other persons. Penn Traffic made untrue statements of material fact in, among other things, Penn Traffic's filings with the Commission for FY 2001 through FY 2003, including the Forms 10-K for FY 2001 and 2002, the Forms 10-Q for FYs 2001, 2002, and 2003, the amended Form 10-K for FY 2002 and amended Form 10-Q for the first quarter of FY 2003, and the Form S-8 filed by Penn Traffic on October 1, 1999, incorporating by reference the above filings, and in other public statements.

108.    By reason of the foregoing, Penn Traffic, singly or in concert, directly or indirectly, has violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

109.    Penn Traffic failed to file factually accurate annual and quarterly reports with the Commission, and failed to provide, in addition to the information expressly required to be included in a statement or report filed with the Commission, such further material information as was necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

110.    By reason of the foregoing, Penn Traffic violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

111.    Penn Traffic failed to make and keep books, records and accounts which in reasonable detail, accurately reflect the transactions and dispositions of assets of the issuer and failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in

accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

112.    By reason of the foregoing, Penn Traffic violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

113.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Knox and Jones aided and abetted Penn Traffic's violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13], and unless enjoined, will again aid and abet violations of these provisions of the Exchange Act and the Rules thereunder. Knox and Jones knowingly provided substantial assistance to Penn Traffic by, among other things, engaging in the conduct alleged in paragraphs 1 through 112 hereof.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court issue a Final Judgment:

## I.

Permanently enjoining Knox and Jones, and their agents, servants, employees, and attorneys, and all persons in active concert or participation with them, who receive

actual notice of the injunction by personal service or otherwise, and each of them, from (a) violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)]; and Rules 10b-5, 13b2-1, and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13b2-2]; and (b) aiding and abetting Penn Traffic's violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, and 240.13a-13].

## II.

Ordering Knox and Jones to disgorge any and all ill-gotten gains they received as a result of their violations of the federal securities laws, and to pay prejudgment interest on all such gains.

## III.

Ordering Knox and Jones to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV.

Permanently barring Knox and Jones from serving as an officer or director of a publicly held company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        September 17, 2007

**s/ Wendy B. Griffin**
Wendy B. Griffin Bar Number: 513967
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 437
New York, New York 10281
Tel: (212) 336-0176
Fax: (212) 336-1320
E-mail: griffinwb@sec.gov

Of Counsel:

David Rosenfeld
David A. Markowitz
Lee S. Bickley